## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JOHN GRACE, individually and on behalf of all those similarly situated,

    *Plaintiff*,

v.

J.P. MORGAN CHASE & CO.,
J.P. MORGAN CLEARING CORP.,
J.P. MORGAN SECURITIES LLC and
JOHN DOES 1-25,

    *Defendants*.

Civil Action No. _____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff John Grace files this class action complaint against defendants J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities LLC, (collectively, "J.P. Morgan"), and John Does 1-25. Plaintiff seeks damages and other relief on behalf of himself and the proposed Class under the Commodity Exchange Act, 7 U.S.C. §1, *et seq*. ("CEA") for injuries caused by Defendants' unlawful and intentional manipulation of U.S. Treasury futures contracts and options on those contracts ("Treasury Futures"). Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges:

### INTRODUCTION

1.      Treasury Futures are standardized contracts for the purchase and sale of U.S. Government notes or bonds for future delivery.[1]

---

[1] CME Group, *The Basis of U.S. Treasury Futures*, *available at*:

2.      Defendants manipulated the prices of Treasury Futures by "spoofing," an illegal and deceptive practice expressly prohibited by the CEA. The Commodity Futures Trading Commission ("CFTC") defines spoofing as "bidding or offering with the intent to cancel the bid or offer before execution," including "submitting or canceling bids or offers with intent to create artificial price movements upwards or downwards."[2]

3.      Throughout the Class Period, Defendants routinely engaged in spoofing to manipulate the prices of Treasury Futures and options on Treasury Futures to benefit their own trading positions, but to the detriment of Plaintiff and the proposed Class.

4.      In its February 25, 2020 Form 10-K, J.P. Morgan Chase & Co admitted that the Department of Justice's Criminal Division ("DOJ") is investigating the company for "trading-practice issues in markets…such as U.S. Treasuries."[3]

5.      J.P. Morgan is no stranger to illegal spoofing in U.S. markets. In recent years, the DOJ has criminally charged a number of J.P. Morgan traders with manipulating the prices of precious metals futures contracts and has characterized the precious metals trading desk as a criminal enterprise. To date, two J.P. Morgan employees have pleaded guilty.[4] One trader

---

https://www.cmegroup.com/trading/interest-rates/basics-of-us- treasury-futures.html (last visited June 10, 2020).

[2] Commodity Futures Trading Commission, Interpretive Guidance and Policy Statement on Disruptive Practices, *available at*: https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/dtp_factsheet.pdf  (last visited June 10, 2020).

[3] J.P. Morgan Chase & Co. 2019 Form 10-K, 280-281, (Feb. 25, 2020) *available at*: https://jpmorganchaseco.gcs-web.com/node/315401/html  (last visited June 10, 2020).

[4] *See United States v. Edmonds*, No. 3:18-cr-00239-RNC-1 (D. Conn. 2019); Order Instituting Proceedings Against John Edmonds Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions, CFTC Docket No. 19-16, July 25, 2019; *United States v. Trunz*, No. 1:19-cr-00375 (E.D.N.Y. 2019); Order Instituting Proceedings Against Christian Trunz Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, And Imposing Remedial Sanctions, CFTC Docket No. 19-26, September 16, 2019.

admitted that he had learned from senior traders at J.P. Morgan to manipulate prices by using spoofing. He further admitted that J.P. Morgan traders had engaged in spoofing on "thousands of occasions," all with the knowledge and approval of supervisors.[5]

6.     Although it has been publicly disclosed that Defendants' Treasury Futures trading practices are subject to criminal investigation, most details of their conduct remain hidden from view. Defendants' illegal practices occurred on futures markets, where participants' activities are shielded by anonymity in order to protect proprietary trading strategies. Defendants also were aware that their conduct was illegal and if exposed would subject them to serious criminal and civil penalties. Accordingly, Defendants' misconduct was concealed. Discovery is likely to yield additional facts to support Plaintiff's allegations.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 28 U.S.C. §§ 1331 and 1337.

8.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. § 25(c). During the Class Period, each Defendant resided, transacted business, was found, or had agents in the District; a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District. Defendants are headquartered in this District.

9.     This Court has personal jurisdiction over each Defendant. A substantial part of the events giving rise to Plaintiff's claims occurred in this District and the United States. Defendants

---

[5] *See* DOJ Press Release (August 20, 2019), "Precious Metals Trader Pleads Guilty to Conspiracy and Spoofing Charges"; CFTC Press Release (Sept. 16, 2019), "Former Precious Metal Trader Admits to Engaging in Spoofing at Two New York Banks".

manipulated the prices of Treasury Futures that Defendants traded in this District and with customers located in the United States. Defendants' manipulation harmed investors in this District and throughout the United States by causing them to pay more for their Treasury Futures purchases and receive less for their Treasury Futures sales than they would have in an unmanipulated market.

10.     Defendants, either themselves or through their subsidiaries as agents, purposefully availed themselves of doing business in the United States and in this District by, *inter alia*: (a) manipulating the prices of Treasury Futures in transactions with investors in this District and throughout the United States; and (b) collecting unlawful overcharges from, and paying unlawful prices to investors in this District and throughout the United States.

**PARTIES**

**I.     Plaintiff**

11.     Plaintiff John "Jack" Grace is an individual residing in Western Springs, Illinois. Mr. Grace is a registered broker and trader with the Chicago Board of Trade. He has actively purchased and sold Treasury Futures on his own behalf for more than 30 years, including throughout the Class Period.

**II.     Defendants**

12.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a Delaware corporation headquartered in New York, New York. JPMC is a multinational banking and financial services corporation.

13.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a Delaware corporation with its principal place of business in New York, New York. JPMorgan is a subsidiary of Defendant JPMC. During the Class Period, JPMorgan, including its predecessors, served as a

primary dealer of U.S. Treasury securities and transacted in U.S. Treasury-based instruments, including Treasury Futures and options on Treasury Futures.

14.     Defendant J.P. Morgan Clearing Corp. ("JPM Clearing") is a Delaware corporation with its principal place of business in New York, New York. JPM Clearing offers securities and futures clearing, settlement, lending, and related services to traders, hedge fund managers, broker-dealers, and investment advisors. It also provides operational and administrative services for registered broker-dealers.

15.     Collectively, JPMC, JPMorgan and JPM Clearing are referred to herein as "J.P. Morgan."

16.     Defendants John Doe 1-25 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly improperly or unlawfully influenced or attempted to influence the trading and prices of Treasury Futures. The term "Defendants" also includes the John Doe Defendants.

17.     During the Class Period, Defendants' subsidiaries or other affiliates of Defendants participated in and furthered the manipulation of Treasury Futures, at artificial prices not based on true supply and demand of these instruments, to Defendants' direct benefit and the ultimate detriment of Plaintiff and the Class as alleged herein.

18.     The acts alleged to have been conducted by Defendants were authorized, ordered, or executed by its directors, officers, managers, agents, employees, or representatives while engaged in the management, direction, or control of that Defendant's business.

19.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants concerning the acts, violations and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

**I.      Overview of Treasury Futures**

20.      In order to help fund its operations, the U.S. government sells securities known as Treasuries (bonds, notes and bills) at regular public auctions held by the Federal Reserve Bank of New York. Treasuries are loans to the U.S. government backed by the full faith and credit of the United States. Holders of Treasury securities are thus creditors of the U.S.

21.      Treasury bonds and notes are sold at fixed terms (2-year, 3-year, 5-year, 7-year, 10-year, 20-year, and 30-year) and at fixed interest rates determined by the prevailing market rates at the time of sale. Treasury bonds have maturities of twenty or thirty years. Treasury notes have maturities of between two and ten years. Treasury bonds and notes pay interest every six months (known as the "coupon"). The interest rates (or "yields") on U.S. Treasuries are used in the pricing of many financial instruments.

22.      The holder of a Treasury bond or note can either hold the security until maturity, at which time the face value (or "par") becomes due and is repaid by the government, or the holder can sell the security in the secondary market prior to maturity. The secondary market for U.S. Treasuries is the world's most liquid government securities market. Treasuries are traded around the clock, leading to constant price fluctuations. In the secondary market, a seller recovers the current market value of the Treasury, which can be more or less than its face value, depending upon prevailing interest rates at the time of the sale. For example, if a Treasury note with a coupon of 2% is sold at time when the prevailing interest rates have declined to 1%, that note will be more valuable than its face value because it pays a higher interest rate to the holder. If, on the other hand, prevailing interest rates have risen to 3%—more than the 2% which the note for sale provides—then the note will be less valuable and will sell at a price below its face

value.

23.     Treasury Futures and options on Treasury Futures—which are the subject of this complaint—are standardized contracts for the purchase and sale of Treasury notes or bonds for future delivery; they provide investors the right to buy or sell Treasuries at a future date, without the need to hold the underlying Treasury in the interim. Treasury Futures and option contracts are available for each of the Treasury benchmark tenors: 2-year, 5-year, 10-year, and 30-year. In addition, the Chicago Mercantile Exchange ("CME") offers Ultra 10-year T-Note Futures and Ultra U.S. Treasury Bond Futures.

24.     Investors in Treasury Futures or options can either buy (*i.e.*, take a "long" position) or sell (*i.e.*, take a "short" position). A long position means that the investor believes that prices will rise; they expect to be able to sell (*i.e.*, settle or close their position) at a higher price in the future. A short position means that the investor believes that prices will decline; they expect to be able to buy (*i.e.*, settle or close their position) at a lower price in the future.

25.     Because Treasury Futures and options are "[a]mong the most liquid products in the world, … [they] lend themselves to a variety of risk management and trading applications, including hedging, income enhancement, duration adjustments, interest rate speculation and spread trades."[6] Accordingly, Treasury Futures and options are used by a broad mix of investors, including asset managers, banks, hedge funds, insurance companies, corporations and individuals.[7]

---

[6] *See* "US Treasury Futures and Options" CME Fact Card, *available at*: https://www.cmegroup.com/trading/interest-rates/files/IR-179_USTreasury_FO_Fact_Card.pdf (last visited June 10, 2020).

[7] Nicholas Fett & Richard Haynes, *The Futures Trading Landscape* (March 10, 2017), *available at*: https://www.cftc.gov/sites/default/files/idc/groups/public/@economicanalysis/documents/file/oce_futureslandscape.pdf (last visited June 10, 2020).

## II.    Illegal "Spoofing"

26.    Treasury Futures and options are very actively traded in a highly liquid market and trades are executed on electronic platforms. In addition, trading on these platforms is anonymous, and the identity of any trader behind a specific bid or ask is unknown to market participants. These characteristics make the market for Treasury Futures and options particularly susceptible to manipulation by an illegal practice known as "spoofing."

27.    Section 747 of the Dodd-Frank Wall Street Reform and Consumer Protection Act amended the Commodity Exchange Act ("CEA") to expressly prohibit certain disruptive trading practices, including spoofing. CEA section 4c(a)(5)(C) defines spoofing as "bidding or offering with the intent to cancel the bid or offer before execution."

28.    Spoofing is used by traders to manipulate prices and it undermines the integrity of trading. The CFTC defines spoofing to include: (a) submitting or cancelling bids or offers to overload the quotations system of a registered entity, (b) submitting or cancelling bids or offers to delay another person's execution of trades, (c) submitting or cancelling multiple bids or offers to create an appearance of false market depth, or (d) submitting or canceling bids or offers with the intent to create artificial price movements upwards or downwards.[8]

29.    As one trader has explained, "Spoofing is extremely toxic for the markets…. Anything that distorts the accuracy of prices is stealing money away from the correct allocation of resources."[9]

---

[8] CFTC Interpretive Guidance and Policy Statement on Disruptive Practices, *available at*: https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/dtp_factsheet.pdf (last visited June 10, 2020).

[9] Bradley Hope, "As 'Spoof' Trading Persists, Regulators Clamp Down," Wall Street Journal (Feb. 22, 2015), available at: https://www.wsj.com/articles/how-spoofing-traders-dupe-markets-1424662202 (last visited June 10, 20120).

30.     The infamous "Flash Crash" in May 2010—when the U.S. stock market temporarily lost approximately $1 trillion in value—was caused by spoofing. The Wall Street Journal published a graphic to illustrate how it works:[10]



**How Spoofing Works**
Traders spoof by offering an artificial price for a contract, profiting when they dupe others into buying or selling at that price, as in the hypothetical below.

**Part 1**
**Spoofer** offers to sell a large order of E-mini S&P 500 contracts at **$2,091.75** each.

Other **sellers** offer to join him at that price, thinking that the current selling price of **$2,092.25** is going down.

**Spoofer** cancels his SELL order and simultaneously BUYS at **$2,091.75**

**Buyers**
Market price for buying E-mini S&P contracts

**Sellers**
Market price for selling E-mini S&P contracts

$2,091.00   $2,091.25   $2,091.50   $2,091.75   $2,092.00   $2,092.25

**Part 2**
**(reverse of Part 1)**
**Spoofer** puts in a large order to BUY at **$2,092.00**

**Buyers** join him at this price.

He then cancels this BUY order and simultaneously SELLS an order at **$2,092.00**.

The result is that the spoofer bought contracts at **$2,091.75** and then turned around and sold for **$2,092.00**, making a profit of **$0.25** on each of thousands of contracts. Using this method to buy and sell numerous large orders can net the spoofer big cumulative profits in just a few hours.

Sources: WSJ review of exchanges guidelines; U.S. Commodity Futures Trading Commission

THE WALL STREET JOURNAL.

---

[10] Bradley Hope, "Navinder Sarao's 'Flash Crash' Case Highlights Problem of 'Spoofing' in Complex Markets," Wall Street Journal (May 6, 2015), available at: https://www.wsj.com/articles/navinder-saraos-flash-crash-case-highlights-problem-of-spoofing-in-complex-markets-1430943635 (last visited June 10, 2020).

31.     By flooding the market with trade orders that are never intended to be filled, a spoofer can create fake demand that pushes prices up or down, which tricks other investors into buying or selling at artificial or manipulated prices. The spoofer can then scoop up the mispriced contracts and reap a profit by flipping them at the true market price.

32.     Although the Flash Crash involved spoofing of S&P 500 futures, the illegal tactic is known to have been used in many other markets, including in the market for Treasury Futures and options. For example, traders at Citibank admitted to illegal spoofing in the Treasury Futures market and Citibank was fined $25 million by the CFTC as a result.[11] Similarly, Mizuho Bank, Ltd. admitted in a CFTC action that one of its traders had engaged in illegal spoofing in the Treasury Futures market.[12] It is thus clear that the use of spoofing techniques to manipulate the prices of Treasury Futures and options is feasible.

## III.    J.P. Morgan's Illegal Spoofing

33.     Over the last ten years, JPMorgan has repeatedly engaged in trading practices that violated federal law and triggered civil and criminal sanctions.[13]

34.     Ongoing investigations by the DOJ and CFTC have exposed widespread and long-running spoofing practices at J.P. Morgan that already have resulted in admissions of guilt by two J.P. Morgan traders.[14] Additional J.P. Morgan traders have pending criminal

---

[11] Gabriel T. Rubin, "CFTC Won't Prosecute Ex-Citigroup Traders Over 'Spoofing'," Wall Street Journal (June 29, 2017), available at: https://www.wsj.com/articles/cftc-wont-prosecute-ex-citigroup-traders-over-spoofing-1498758428 (last visited June 10, 2020).

[12] *In the Matter of Mizuho Bank, Ltd.*, CFTC Docket No. 18-38 (Sept. 21, 2018), available at: https://www.cftc.gov/sites/default/files/2018-09/enfmizuhobankorder092118.pdf (last visited June 10, 2020).

[13] For example, in 2013, J.P. Morgan agreed to pay U.S. federal energy regulators $410 million in connection with "power" market manipulation claims. It also agreed to pay a criminal fine of $550 million in connection with a Plea Agreement in May 2015 related to market-rigging of the FX spot market.

[14] DOJ Press Release, "Former Precious Metals Trader Pleads Guilty to Commodities

indictments.[15] "[M]ore than a dozen people" are alleged to have participated in the J.P. Morgan spoofing scheme.[16]

35.     Defendant JPMC is currently a defendant in this Court in a similar action alleging the use of spoofing to manipulate the prices of NYMEX platinum futures contracts, NYMEX palladium futures contracts, COMEX silver futures contracts, COMEX gold futures contracts, and options on those futures contracts, in violation of the CEA, 7 U.S.C. § 1, *et seq.*

36.     Recently, J.P. Morgan disclosed that these government investigations into spoofing—which initially focused on manipulative trading of precious metals futures—have expanded into Defendants' trading of Treasury instruments, as stated in recent filings with the SEC:

> *Metals and U.S. Treasuries Investigations and Litigation and Related Inquiries.*
> Various authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct. The Firm also is responding to related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries.[17]

37.     "According to people familiar with the matter," the DOJ investigation

---

Fraud and Spoofing Conspiracy" (Nov. 6, 2018), *available at*:
https://www.justice.gov/opa/pr/former-precious-metals-trader-pleads-guilty-commodities-fraud-and-spoofing-conspiracy (last visited June 10, 2020); DOJ Press Release, "Precious Metals Trader Pleads Guilty to Conspiracy and Spoofing Charges," (Aug. 20, 2019) *available at*:
https://www.justice.gov/opa/pr/precious-metals-trader-pleads-guilty-conspiracy-and-spoofing-charges (last visited June 10, 2020).

[15] *See, e.g.*, Superseding Indictment, *United States v. Gregg Smith, Michael Nowak, Jeffrey Ruffo, and Christopher Jordan*, No. 19 CR 669 (EEC) (N.D. Ill. No. 14, 2019), ECF No. 52 at ¶ 26e.

[16] Tom Schoenberg and David Voreacos, "JPMorgan's Metals Desk was a Criminal Enterprise, U.S. Says," *Bloomberg* (Sept. 16, 2019), *available at*:
https://www.bloomberg.com/news/articles/2019-09-16/jpmorgan-s-metals-desk-was-a-criminal-enterprise-u-s-says (last visited June 10, 2020).

[17] J.P. Morgan Chase & Co. 2019 Form 10-K, 280-281, (Feb. 25, 2020) *available at*:
https://jpmorganchaseco.gcs-web.com/node/315401/html (last visited June 10, 2020)

encompasses J.P. Morgan's trading of Treasury Futures. Officials in the "Justice Department's Fraud Section and regulators at the Commodity Futures Trading Commission are involved" in the investigation.[18]

38.     Christian Trunz, a former metals trader for Defendants, pleaded guilty to "one count of conspiracy to engage in spoofing and one count of spoofing." He admitted that between July 2007 and August 2016 he placed ***thousands*** of orders that he did not intend to execute for gold, silver, platinum, and palladium futures contracts traded on CME Group-operated exchanges.[19]

39.     The most shocking aspect of Trunz's admission was not the pervasiveness of his misconduct, but that his conduct was known to and encouraged by his supervisors. He was not a rogue trader; spoofing was part and parcel of the institutional trading strategy at J.P. Morgan. "Trunz learned to spoof from more senior traders, and spoofed with the knowledge and consent of his supervisors" and is cooperating with authorities.[20]

40.     In fact, the DOJ has brought criminal racketeering charges, among other charges, against J.P. Morgan, essentially characterizing the entire metals trading operation there as a criminal enterprise.[21]

---

[18] *See* Dave Michaels, "Government is Broadening Investigations of Spoofing-Like Practices," Wall Street Journal, (Mar. 17, 2020), *available at*: https://www.wsj.com/articles/government-is-broadening-investigations-of-spoofing-like-practices-11584446400 (last visited June 10, 2020). *See also* Global Investigations Review, "DOJ Expands JPMorgan Spoofing Probe," (Mar. 17, 2020), *available at*: https://globalinvestigationsreview.com/short-cut/2020/march/17 (last visited June 10, 2020).

[19] DOJ Press Release, "Precious Metals Trader Pleads Guilty to Conspiracy and Spoofing Charges," (Aug. 20, 2019) *available at*: https://www.justice.gov/opa/pr/precious-metals-trader-pleads-guilty-conspiracy-and-spoofing-charges (last visited June 10, 2020).

[20] *Id.*

[21] *See, e.g.,* Tom Schoenberg and David Voreacos, "JPMorgan's Metals Desk was a Criminal Enterprise, U.S. Says," *Bloomberg* (Sept. 16, 2019), *available at*: https://www.bloomberg.com/news/articles/2019-09-16/jpmorgan-s-metals-desk-was-a-criminal-

41.     The extent and longevity of Defendants' spoofing practices shocks the

conscience. The ongoing DOJ and CFTC investigations have revealed that J.P. Morgan

cultivated a trading culture and strategy rooted in market manipulation, including the systemic

use of spoofing to bolster its profits at the expense of other market participants.

42.     The guilty pleas and indictments of the metals traders at J.P. Morgan demonstrate

how Defendants used spoofing to manipulate prices. Specifically, the pending 14-count

indictment against traders Michael Nowak, Gregg Smith, and Christopher Jordan alleges:

> Defendants and their co-conspirators placed orders to buy and sell precious metals
> futures contracts with the intent to cancel those orders before execution, including
> in an attempt to artificially affect prices and to profit by deceiving other market
> participants. More specifically:
>
> a) In thousands of trading sequences, the Defendants and their coconspirators
>    placed one or more orders for precious metals futures contracts that they
>    intended to execute ("Genuine Orders"). Sometimes, but not always, the
>    Genuine Orders were iceberg orders, so that other market participants could
>    see only a portion of the order's full size at any given time.
>
> b) During the same trading sequences, the Defendants and their coconspirators
>    also placed one or more orders that they intended to cancel before execution
>    ("Deceptive Orders") on the opposite side of the market from the Genuine
>    Orders. The Deceptive Orders were not iceberg orders, and so the full order
>    size was visible to other market participants.[22]

43.     By placing Deceptive Orders, Defendants' employees sought to distort

information about the actual supply and demand for futures contracts, and thereby deceive other

market participants into believing that the visible order book accurately reflected true market-

based forces of supply and demand. "This false and misleading information was intended to, and

at times did, trick other market participants into reacting to the apparent change and imbalance in

---

enterprise-u-s-says (last visited June 10, 2020).

     [22] Superseding Indictment, *United States v. Gregg Smith, Michael Nowak, Jeffrey Ruffo, and Christopher Jordan*, No. 19 CR 669 (EEC) (N.D. Ill. Nov. 14, 2019), ECF No. 52.

supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded."[23]

44.     Prosecutors also highlighted the extent to which J.P. Morgan honed and designed its spoofing to be especially effective. For example, J.P. Morgan traders layered multiple Deceptive Orders at different prices in rapid succession that, in the aggregate if not individually, were substantially larger than the visible portion of the opposite-side Genuine Order. J.P. Morgan's innovative "layering" required more forethought and coordination, but it was more effective at deceiving the market and more difficult for regulators—and other market participants—to detect.

45.     The intentionality, scope and pervasiveness of J.P. Morgan's spoofing in the precious metals markets makes it unlikely that such strategies were limited to those markets and traders. "J.P. Morgan is one of the most highly capitalized market leaders in the futures and options brokerage business…. [It] clear[s] more than 70 exchanges, with electronic trading access to over 50 of them."[24] It is unlikely that a profitable, albeit illegal, trading strategy that was systematically employed with the knowledge and encouragement of J.P. Morgan supervisors, would not also be used to bolster trading profits across other trading desks. Indeed, the recent disclosure that J.P. Morgan is being investigated for the spoofing of Treasury securities and Futures confirms that such conduct was not confined to the metals traders at J.P. Morgan.

---

[23] DOJ Press Release, "Superseding Indictment Charges Former Precious Metals Salesman with Racketeering Conspiracy," (Nov. 15, 2019), *available at*: https://www.justice.gov/opa/pr/superseding-indictment-charges-former-precious-metals-salesman-racketeering-conspiracy (last visited June 10, 2020).

[24] J.P. Morgan Markets, "Futures & Options and OTC Clearing," *available at*: https://www.jpmorgan.com/jpmpdf/1320613563458.pdf (last visited June 10, 2020).

46.    Throughout the Class Period, Defendants perpetrated a sophisticated scheme in which they polluted the Treasury Futures market with false and illegitimate signals of supply and demand for the express purpose of inducing other market participants, including Plaintiff and the proposed Class, to trade against Defendants' genuine orders (*i.e.*, orders that Defendants did want to execute on the opposite side of the market from the spoof orders) at prices, quantities, and times at which Plaintiff and the Class otherwise would not have traded, in order to benefit themselves.

47.    Defendants routinely placed electronic orders to buy and sell Treasury Futures with the intent to cancel those orders before execution. This spoofing conduct directly harmed Plaintiff and the Class.

48.    The impact of Defendants' spoofing extended beyond the market for Treasury Futures and options on those futures because traders and investors across a variety of markets evaluate the prices of Treasury Futures in assessing other investment products.

## IV.    Class Action Allegations

49.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated. The "Class" is defined as:

> All persons or entities who transacted in Treasury Futures or options on Treasury Futures that were traded on a United States exchange during the period January 1, 2009 through the present ("Class Period"), where such persons or entities were domiciled in the United States or its territories. Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, employee, agent or co-conspirator of any Defendant.

50.    Class members are so numerous and geographically dispersed that joinder of all members is impracticable. There are hundreds or thousands of individuals or entities that purchased, sold, or held relevant Treasury Futures and options on Treasury Futures during the Class Period at prices and quantities impacted by Defendants' unlawful conduct. While the exact

number and identity of Class members is unknown to Plaintiff, this information can be
ascertained from readily available information.

51.     Plaintiff's claims are typical of the claims of other Class members. Plaintiff and
the members of the Class were injured by Defendants' common course of conduct. The injuries
and damages of each Class member were directly caused by Defendants' wrongful conduct.

52.     There are no conflicts between Plaintiff and the members of the Class. Plaintiff
will fairly and adequately protect the Class's interests. Plaintiff is represented by competent and
experienced class action counsel.

53.     Common questions of law and fact predominate over any questions affecting only
individual Class members, such that certifying this case as a class action is superior to other
available methods for the fair and efficient adjudication of this dispute. Questions of law and fact
common to all Class members, include, but are not limited to:

> a.   whether Defendants participated in the Treasury Futures market;
>
> b.   whether Defendants fixed, lowered, maintained, stabilized, or otherwise
>      manipulated Treasury Futures prices;
>
> c.   the timing, nature and duration of Defendants' manipulation of Treasury
>      Futures prices;
>
> d.   whether Defendants conduct violated the CEA;
>
> e.   whether Defendants' unlawful conduct injured the business or property of
>      Plaintiff and the Class;
>
> f.   whether Defendants fraudulently concealed their misconduct from Plaintiff
>      and the Class; and
>
> g.   the class-wide measure of damages arising from Defendants' unlawful
>      conduct.

54.     Class action treatment is a superior method for the fair and efficient adjudication
of this matter. Class treatment will permit a large number of similarly situated persons and

entities to prosecute their claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require. The benefits of proceeding as a class action, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

55.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

56.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## V.     Equitable Tolling and Fraudulent Concealment

57.     Plaintiff and the Class did not and could not know of Defendants' unlawful acts before February 25, 2020, at which time Defendants disclosed in their 2019 Form 10-K filing with the SEC that regulators were investigating their trading of Treasury instruments.

58.     Defendants actively, fraudulently, and effectively concealed their unlawful conduct and manipulation of the Treasury Futures market.

59.     Defendants never disclosed that they placed "spoofed" orders to manipulate the prices of Treasury Futures and options on Treasury Futures. Indeed, the very purpose of Defendants' spoofing was the deception of Plaintiff and the Class; only by tricking counter-parties into believing in the artificial demand created by their spoofed orders could Defendants complete their series of trades for a profit—which they did.

60.     Defendants' manipulation is also inherently self-concealing. Trades on electronic

platforms are anonymous. Therefore, Plaintiff and the Class could not have discovered Defendants' conduct prior to Defendants' public disclosures.

61.     Defendants also affirmatively conveyed to Plaintiff and the Class that they abided by market rules and laws, including the CEA prohibition on spoofing. For example, JPMorgan Chase & Co. published a "Code of Conduct" during the Class Period that applied to "all its direct and indirect subsidiaries." In the Code of Conduct, JPMorgan Chase & Co. claimed that it was "committed to complying with the letter and spirit of applicable competition laws wherever we do business."

62.     As a result of the concealment of Defendants' unlawful conduct and the self-concealing nature of Defendants' unlawful acts, Plaintiff asserts the tolling of the applicable statute of limitations.

63.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**FIRST CLAIM FOR RELIEF**
**Manipulation of Treasury Futures**
**in Violation of the Commodity Exchange Act**
**(7 U.S.C. §1, *et seq*. and Regulation 180.2)**
**(Against All Defendants)**

64.     Plaintiff incorporates and realleges by reference the above allegations in full.

65.     During the Class Period Defendants intended to and did cause artificial prices of Treasury Futures in violation of the CEA, 7 U.S.C. §1, et seq., through the use of spoofing and other manipulative conduct.

66.     By spoofing the Treasury Futures market, Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of any registered entity in violation of the CEA.

67.     During the Class Period, Treasury Futures' prices did not result from the legitimate market information and the forces of supply and demand. Instead, Treasury Futures' prices were artificially manipulated by Defendants' spoofing conduct.

68.     Throughout the Class Period, Defendants entered large orders to buy or sell with no intention of filling them, instead planning to cancel those orders prior to execution. Defendants polluted the market with false information about supply and demand to manipulate prices up or down. As a result of this conduct, Plaintiff and the Class were damaged by losses on their Treasury Futures trades.

69.     Defendants' manipulative conduct of Treasury Futures' prices persisted throughout the Class Period and caused damages to Plaintiff and Class members who purchased or sold at the artificial prices.

70.     Defendants had the ability to cause, intended to cause and did cause artificial prices of Treasury Futures. Defendants were active in the markets for Treasury Futures throughout the Class Period and were aware of the effects of spoofing on the markets.

71.     By their intentional misconduct, each Defendant violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§9, 13b, 13(a), and 25(a), throughout the Class Period.

72.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

73.     Plaintiff and the Class are each entitled to actual damages sustained in Treasury Futures for the CEA violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Employing a Manipulative and Deceptive Device
### in Violation of the Commodity Exchange Act
### (7 U.S.C. §1, *et seq.* and Rule 180.1(a))
### (Against All Defendants)

74.     Plaintiff incorporates and realleges by reference the above allegations in full.

75.     Defendants' spoofing conduct, including the use of submitting and cancelling orders and engaging in other manipulative conduct in order to artificially move prices for Treasury Futures, constitutes use of a manipulative and deceptive device.

76.     Defendants acted intentionally, or at least acted recklessly, in employing the manipulative and deceptive device. The ability of Defendants' spoof orders to mislead other market participants into believing there was genuine demand for purchasing or selling as represented by the Defendants' deceptive orders must have been known to Defendants.

77.     Defendants knew that their spoof orders would impact the trading decisions of other market participants; thus, Defendants were, at a minimum, reckless with respect to the danger that their spoof orders would mislead other market participants.

78.     Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§9 and 25(a), throughout the Class Period.

79.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury Futures contracts and options on those Futures contracts to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

80.     Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

### THIRD CLAIM FOR RELIEF
**Vicarious Liability**
**for Violation of the Commodity Exchange Act**
**(7 U.S.C. §1, *et seq.*)**
**(Against All Defendants)**

81.     Plaintiff incorporates and realleges by reference the above allegations in full.

82.     Defendants are liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

83.     Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

### PRAYER FOR RELIEF

Plaintiff requests that This Honorable Court grant the following relief:

A.     That the Court Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that Plaintiff be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.     That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C.     That the Court award Plaintiff damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.     That the Court issue appropriate injunctive and other equitable relief against Defendants;

E.     That the Court award Plaintiff pre- and post-judgment interest;

F.     That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses including costs of consulting and testifying experts; and

G.     That the Court award any and all such other relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial as to all issues pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Date:  June 12, 2020                                Respectfully submitted:

                                By:___/s Adam J. Pessin_____
                                Roberta D. Liebenberg (*pro hac vice* motion to be filed)
                                Adam J. Pessin
                                FINE, KAPLAN AND BLACK, R.P.C.
                                One S. Broad St., 23rd Floor
                                Philadelphia, PA 19107
                                (215) 567-6565
                                rliebenberg@finekaplan.com
                                apessin@finekaplan.com


                                Michael E. Criden
                                Kevin B. Love
                                Lindsey C. Grossman
                                CRIDEN & LOVE, P.A.
                                7301 S.W. 57th Court, Suite 515
                                South Miami, FL 33143
                                (305) 357-9000
                                mcriden@cridenlove.com
                                klove@cridenlove.com
                                lgrossman@cridenlove.com

                                *Counsel for Plaintiff and the Proposed Class*